**UNITED STATES DISTRICT COURT** **99-1639**
**SOUTHERN DISTRICT OF FLORIDA** **CIV-HOEVELER**

MAGISTRATE JUDGE
DUBÉ

|  |  |
|---|---|
| MARK KRUG, on behalf of himself and all others similarly situated, ) ) ) | CIVIL ACTION NO. _____ |
| Plaintiff, ) ) | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS** |
| vs. ) ) | **JURY TRIAL DEMANDED** |
| CELLSTAR CORPORATION, ALAN H. GOLDFIELD, RICHARD M. GOZIA and MARK Q. HUGGINS, ) ) ) ) | |
| Defendants. ) ) ) | |

Plaintiff has alleged the following based upon the investigation of his counsel, which included, among other things, a review of CellStar's SEC filings, regulatory filings and reports, securities analysts reports and advisories about the Company, press releases and other public statements issued by the Company, media reports about the Company, and believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a securities class action brought on behalf of a class (the "Class") consisting of all persons or entities who purchased publicly-traded securities of defendant CellStar Corporation ("CellStar" or the "Company") between March 19, 1998, and September 21, 1998, inclusive (the "Class Period"),



to recover damages caused to the Class by defendants' violations of the federal securities laws.

2.    Defendant CellStar is a wholesale distributor of wireless communications products and value-added logistic services to customers around the world.  This case involves defendants' dissemination of materially false and misleading statements during the class period regarding CellStar's purported "record" financial results, its alleged competitiveness and the positive trends in its business.

3.    Public investors -- who invested in CellStar based on the Company's reported financial results, its representations about the alleged success of its entry into the pre-paid cellular business primarily through an investment in Topp Telcom, Inc. ("Topp") as well as its forecasts of strong revenue and earnings growth in fiscal 1998 -- paid as high as $17.875 per share for CellStar stock during the Class Period and have suffered substantial damages as a result of defendants' misrepresentations.  During fiscal 1998, CellStar reported "record" financial results with strong revenue growth and profitability causing the Company's stock to trade at artificially inflated levels.  Unbeknownst to investors, Cellstar was making a material and substantial amount of sales to Topp for which it was not being paid nor did Cellstar seek payment or expect to be paid. Ultimately, CellStar was forced by its auditors to change its accounting for its investment in Topp and its sales to Topp -- treating its receivables as an "investment" and changing from

- 2 -

cost accounting to equity accounting -- and to recognize 100% of Topp's losses in its income statement, thereby causing CellStar to report a significant loss in the third quarter of fiscal 1998, contrary to previous expectations in the market.  CellStar's reported revenues and earnings were, as a result, overstated in the first and second fiscal quarters of 1998.

4.    Upon these startling revelations, CellStar's stock price dropped precipitously, falling to $5.00 per share, a more than 72% reduction from its Class Period high of $17.875.  The following chart shows the price of CellStar's stock during the Class Period, as defendants were making false statements (and omissions), and its large drop when CellStar was forced to change its accounting for its investment in Topps in the third quarter of fiscall 1998 and reverse all of the profits previously recognized on purported sales to Topps in the first and second quarters of fiscal 1998.

Case 1:99-cv-01639-DLG   Document 1   Entered on FLSD Docket 06/15/1999   Page 4 of 44



**CELLSTAR**

Daily Price/Volume : 3/02/98 - 10/1/98

Class Period
03/19/98 - 09/21/98

CLST

VOLUME

## JURISDICTION AND VENUE

5.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1337 and 1367, and Section 27 of the Securities Exchange Act of 1934 (15 U.S.C. § 78aa) (the "Exchange Act").

6.    This action arises under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

7.    Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa).   Substantial acts in furtherance of the alleged fraud and/or its effects have occurred within this District.   This District has a substantial connection with the subject matter of this case and the parties and third parties involved.

8.    In connection with the acts and omissions alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

9.    Plaintiff Mark Krug purchased CellStar common stock during the Class Period, as set forth in the accompanying certification which is incorporated herein by reference, and was damaged thereby.

- 5 -

10.   Defendant CellStar is incorporated under the laws of the State of Delaware and maintains its corporate headquarters at 1730 Briercroft Court, Carrollton, Texas 75006.  The Company is a wholesale distributor of wireless communications products and value-added logistic services to customers around the world. CellStar engages in substantial business within this District, as further described herein.

11.   Defendant Alan H. Goldfield ("Goldfield") is, and was at all relevant times, Chairman of the Board of Directors and Chief Executive Officer of the Company.   According to the Company's May 19, 1998 Proxy Statement, Goldfield beneficially owns 10,313,055 or 34.7%, of the Company's outstanding shares of common stock.

12.   Defendant Richard M. Gozia ("Gozia") is, and was at all relevant times, the President, Chief Operating Officer and a Director of the Company.

13.   Defendant Mark Q. Huggins ("Huggins") is, and was at all relevant times, the Chief Financial Officer and Principal Accounting Officer of the Company.

14.   Defendants Goldfield, Gozia and Huggins are sometimes hereinafter collectively referred to as the "Individual Defendants."  By reason of their positions as officers and/or directors and, in the case of Goldfield, a significant shareholder of CellStar, the Individual Defendants were, at all relevant times, controlling persons within the meaning of Section 20(a) of the 1934 Act.  Because of their executive, managerial,

- 6 -

and directorial positions with CellStar, the Individual Defendants had access to adverse, non-public information about the reported acquisitions, transactions and funding of the Company as well as the financial condition and business operations of CellStar as particularized herein.  Any acts attributed to CellStar were caused and/or influenced by the Individual Defendants by virtue of their domination and control thereof.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

15.  Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons who purchased or otherwise acquired CellStar common stock between March 19, 1998, and September 21, 1998, inclusive, (the "Class Period") and who were damaged thereby.  Excluded from the Class are defendants, members of the immediate family of each of the Individual Defendants, any subsidiary or affiliate of CellStar and the directors, officers and employees of CellStar or its subsidiaries or affiliates, or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

16.  The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are thousands of members of the Class located

throughout the United States. During the Class Period, there were reportedly more than 29 million shares of CellStar common stock outstanding. Throughout the Class Period, CellStar common stock was actively traded on the NASDAQ National Market System. Record owners and other members of the Class may be identified from records maintained by CellStar and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

17. Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

18. Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

19. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

i) whether the federal securities laws were violated by defendants' acts and omissions as alleged herein;

ii) whether defendants participated in and pursued the common course of conduct complained of herein;

iii) whether documents, press releases, and other statements disseminated to the investing public and the Company's

shareholders during the Class Period misrepresented material facts about the business, finances and prospects of CellStar;

iv)   whether statements made by defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, value, performance and prospects of CellStar;

v)   whether the market price of CellStar common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

vi)   to what extent the members of the Class have sustained damages and the proper measure of damages.

20.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this suit as a class action.

## SUBSTANTIVE ALLEGATIONS

### Background To The Class Period

21.   CellStar is a wholesale distributor of wireless communications products and value-added logistic services to customers around the world.  CellStar has approximately seven wholesale distribution centers and 43 retail locations worldwide

from which it is authorized to distribute products from brand-name vendors such as Motorola, Ericsson, Nokia and Qualcomm.

22.  CellStar went public _via_ an initial public offering in 1993.  Between 1993 and 1995, CellStar enjoyed increasing reported revenues and earnings, with its reported earnings growing at a compounded average growth rate (CAGR) of 47.6%.  In 1996, the Company reported disappointing earnings resulting from declining sales, problems with its Latin American and Asian sales channels, inventory problems and a failed retail venture.  For fiscal year 1996, ending on November 30, 1996, CellStar reported a loss of $0.22 per share as compared to earnings of $0.85 per share in fiscal 1995.

23.  In mid-year 1996, in response to the Company's declining results, CellStar took several measures which were purportedly designed to restore the Company's profitability and reverse its negative trends.  With respect to Latin America, the Company modified its exposure to that region by transitioning its business from direct sales to sales to exporters, primarily located in Miami, Florida, who would then sell into Latin America.  The Company also purportedly (i) improved its budgeting and planning processes; (ii) upgraded its information systems; (iii) improved the logistics and information systems used in its warehouse; and (iv) allegedly engaged in efforts to reduce excessive expenses.   At all relevant times, the Company falsely represented that these changes and modifications were producing positive results.

- 10 -

## CellStar's Relationship With Topp

24.  Topp Telcom, Inc. ("Topp") is reportedly a leading provider of pre-paid cellular phones and services in the United States.  Topp is located at 8200 NW 17th Street, Suite 117, Miami, Florida.

25.  According to a Dun & Bradstreet ("D&B") report, as of September 30, 1997, Topp had projected annual sales of $100 million and no credit rating was assigned "because the amount of the pending public [lien] filings in the D&B file is high in relation to the company's worth and because of D&B's 'unbalanced' assessment of the company's September 30, 1997, interim financial statement."  The interim September 30, 1997, Topp financial statements reflected a negative net worth of $57,287 and a negative working capital balance of approximately $2,000,000.

26.  On December 9, 1997, CellStar announced that it had completed a strategic, minority equity investment in Topp.  As part of this strategic relationship, CellStar was to provide all distribution and facilitation services for Topp.

27.  Prior to CellStar's investment in Topp, Topp had a contract with Uniden to purchase analog phones ("handsets") from Uniden on a monthly basis.  Under this contract, Topp was required to purchase a minimum number of handsets per month from Uniden.  Topp, however, could not fulfill its obligation under the contract.  After CellStar made its initial investment in Topp, CellStar assumed responsibility of the Uniden contract from Topp.  Subsequently, Topp would receive purchase orders for

- 11 -

handsets and forward the order to CellStar for fulfillment.  As a result of this arrangement, CellStar had full knowledge of the state of Topp's business operations and trends.

28.  By the start of the Class Period, March 19, 1998, Topp's financial condition was strained and it was unable to pay for any handsets it had purchased from CellStar or would purchase in the foreseeable future.  In fact, Topp was using all of its income from handset sales to pay its operating expenses.  Thus, by at least the start of the Class Period, CellStar knew that it would not be paid by Topp for the handsets it had sold to Topp (and in fact was not attempting to collect any of those receivables).  Notwithstanding these facts, CellStar recognized all of the sales to Topp as <u>bona</u> <u>fide</u> sales, when, in fact, they were not.  As a result, CellStar reported artificially inflated financial results during the Class Period and disseminated financial statements that were materially false and misleading.

<b>Materially False And Misleading<br><u>Statements Issued During The Class Period</u></b>

29.  On March 19, 1998, CellStar issued a press release announcing its first quarter financial results (which it described as "record") for the period ending February 28, 1998. The Company reported $406.7 million in revenues and net income of $14.2 million, or $0.49 per share, as compared to $256.6 million and $6.0 million, or $0.21 per share, for the same period the prior year.  Defendant Goldfield commented on the results as follows:

> Our first quarter revenues were higher than fourth quarter revenues despite the fact that the cellular industry normally achieves proportionately higher sales in the fourth quarter holiday season.  First quarter results reflect our strong position globally, our firmly established relationships with the leading handset manufacturers and wireless carriers, and our highly effective sales force and human resources talent.  CellStar, with its 58.5% growth in first quarter revenues year over year, continues to surpass the industry's overall growth rate because we have operations in most of the fastest-growing regions of the world where the demand for wireless services is growing at an unprecedented rate.

The press release also highlighted the Company's U.S. operations as follows:

> Revenues from U.S. operations in the first quarter were $232.1 million compared to $154.4 million for the year-earlier period. <u>The increase occurred primarily from continued strong growth in sales from the Company's Miami, Florida warehouse to customers exporting to South America and from the sale of products and value-added services to Pacific Bell Mobile Services.</u> [Emphasis added.]

Defendant Gozia also commented on the results as follows:

> As we entered 1998, we established CellStar's goals for the year, including diversifying and expanding major vendor and carrier relationships; growing through acquisitions; and expanding value-added and activation services.  Combined, these efforts should enable us to continue to grow revenues and net income well in excess of wireless phone industry averages.  Each of these goals is achievable because we have a strong balance sheet and have the capital required to support these objectives.  <u>As we continue to make conservative acquisitions, build our customer base and expand our value-added service offerings, we expect to grow our revenues while maintaining our industry-leading margins</u> . . . [Emphasis added.]

30.   On or about April 13, 1998, CellStar filed a quarterly report on Form 10-Q with the SEC, which was signed by defendant Huggins, for the fiscal quarter ended February 28, 1998, and which confirmed the previously announced financial results.   The Form 10-Q reported that as of February 28, 1998, the Company had account receivables of $220,625,000 which was net of $24,716,000 in allowances for doubtful accounts.   The Form 10-Q stated in pertinent part (on page 10) that:

> U.S. revenues increased by $77.7 million, or 50.3%, primarily from an increase in net product sales of $80.8 million, or 54.6%, from $148.1 million to $228.9 million.   The increase in net product sales was largely due to the growth in sales from the Company's Miami, Florida warehouse to customer exporting into South American countries.

The Form 10-Q also represented:

> Although the interim consolidated financial statements of CellStar Corporation (the "Company") are unaudited, it is the opinion of the Company's management that all adjustments (consisting of only normal recurring adjustments) necessary for a fair statement of the results have been reflected therein.

31.   The statements referenced above in ¶¶ 29 and 30 were each materially false and misleading when issued as they failed to disclose and misrepresented the following adverse facts which were then known to defendants or recklessly disregarded by them:

(a)   that CellStar was booking a substantial and material amount of revenues in connection with alleged "sales" to Topp and that such sales were not <u>bona fide</u> sales as CellStar did

not expect that it would be paid by Topp and, in fact, was not seeking payment from Topp;

(b)   that CellStar had assumed Topp's obligation under the Uniden contract and, accordingly, had become the primary financier of Topp through its supply of handsets to Topp and steady accrual of receivables from Topp;

(c)   that CellStar's entry into the pre-paid cellular business via Topp was not succeeding as Topp was experiencing significant losses and was unable to pay CellStar for any of the handsets it had purchased from it;

(d)   that as a result of Topp's strained financial condition and its inability to pay CellStar for any of the handsets it had purchased from it, CellStar was searching for additional investors for Topp in an effort to recoup its investment in Topp and reverse Topp's financial decline;

(e)   based on (a)-(d), CellStar's previously announced investment in Topp was not "conservative", see ¶ 29 supra, and in fact was subject to [with] significant risk and uncertainty;

(f)   CellStar's reported financial results were artificially inflated and its financial statements were not prepared in accordance with GAAP as set forth in detail in ¶¶ 49-59 below;

(g)   that it was not true that CellStar's interim financial statements contained "all necessary adjustments for a

fair presentation" of CellStar's financial results as set forth in detail in ¶¶ 49-59 below; and

(h)   based on the foregoing, defendants' beliefs, opinions, estimates as to CellStar, its business and operations were lacking in reasonable basis at all relevant times.

32.   On June 23, 1998, CellStar issued a press release announcing its financial results for the second fiscal quarter of 1998, the period ending May 31, 1998.  The Company reported revenues of $445.7 million and net income of $16.6 million, or $0.28 per share, as compared to $377.6 million and $14.2 million, or $0.25 per share, for the same period the prior year. Defendant Gozia was identified as the press contact, announcing "record revenues and net income for the seventh quarter in a row . . . ."  The press release also stated, among other things, that:

> Revenues were $211.4 million in the second quarter, compared to $189.1 million for the year-earlier period for the North American Region, which is comprised of sales in the U.S. The increase occurred primarily from continued strong growth in sales from the Company's Miami, Florida warehouse to customers exporting to South America and from the sale of products and value-added services to wireless phone carriers. [Emphasis added.]

The press release also made the following statement with respect to the Company's reported accounts receivable:

> Accounts receivable at the end of the quarter were $267.9 million, compared to $176.0 million at November 30, 1997.  The increase resulted primarily from significantly higher sales activity in the PRC and Mexico, the increase of in-country sales in South America and receivables associated with the recently

- 16 -

> acquired operations in Sweden and Poland, all of which typically have longer credit terms. As a result, the number of days sales outstanding in accounts receivable increased to approximately 50 days.

The Company indicated no unusual risks or problems relating to the value or collectibility of its receivables.

33. On May 12, 1998, CIBC Oppenheimer issued an analyst report, which was based on detailed guidance from defendants, rating Cellstar a "Strong Buy" and projecting the following earnings for Cellstar:

|  | 1st Qtr. | 2nd Qtr. | 3rd Qtr. | 4th Qtr. | Year |
|---|---|---|---|---|---|
| FY 1998E | $0.235A[1] | $0.275E | $0.31E | $0.345E | $1.175E |

34. On June 23, 1998, subsequent to the release of its second quarter 1998 results, CellStar held a telephonic conference call for securities analysts, money and portfolio managers, institutional investors, large shareholders, brokers and stock traders to discuss the Company's reported second quarter results, its business and its prospects. During the call, Goldfield and Huggins made presentations and answered questions. During the call -- and in follow-up conversations that same-day with participants, including analysts, institutional investors and other market participants -- they directly disseminated important, material information to the market. For example, with respect to the Company's Latin America operations, defendant Gozia stated:

---

[1] All per share estimates are on a split-adjusted basis. Cellstar split its stock 2-for-1 on May 19, 1998.

> Speaking of Latin America the revenues in this region continue to increase significantly.  Up over 200% from the second quarter of 1997 and over 22% from the first quarter of 1998.  CellStar made a decision in 1996 to maintain our country presence in the seven countries in South America even though that we knew these countries would not show significant growth for some time.
>
> This investment is now paying off for us with significant growth we are now achieving in the region.  CellStar is the strongest distribution channel in Latin America and we are anticipating excellent growth in this region as the demand expands in the future.

Defendant Huggins reassuringly addressed the rise in Days Sales Outstanding, which rose from 44 days to approximately 50 days by stating, among other things:

> Going forward we expect to continue to see DSOs in the 40 to 50 days range.  We have not seen any significant deterioration in the ability of our customers to pay us.  We continue to employ consistent policies and procedures in reserving for bad debt.
> [Emphasis added.]

Defendant Gozia positively commented on the Company's prospects and goals for the remainder of 1998, emphasizing the Company's Topp relationship:

> Our strategy commits us to support wireless phone carriers and in 1998 we pursued expansion into new areas that are related to our prior distribution business in this endeavor.  The prepaid wireless phone business is growing significantly around the globe and CellStar is committed to part of the growth. . .
>
> We also have a minority interest in Topp Telecom, a handheld wireless prepaid system, headquartered in the United States.  Topp's total subscriber accounts exceed 78,000 active subscribers at April 30, 1998, and is growing at the rate of 15,000 new subscribers

a month. . . . <u>We believe that prepaid</u>
<u>wireless will be a fast growing business in</u>
<u>the near future and expect to be a key player</u>
<u>in this profitable industry segment. . . . .</u>

<u>[W]e see new growth from our prepaid systems</u>
<u>in Latin America and our minority interests</u>
<u>in Topp Telecom and possibly some global</u>
<u>satellite business.  Through the first half</u>
<u>of 1998 has been another exciting year for</u>
<u>CellStar and we are just as excited about our</u>
<u>prospects for the remainder of 1998.</u>
[Emphasis added.]

35.  Defendants' materially false and misleading statements had their intended effect.  On June 23, 1998, J.C. Bradford & co. issued an analyst report which was based on detailed guidance from defendants and which rated CellStar common stock a "Buy".  The report stated in pertinent part:

> We believe CellStar will strongly outperform the market during the next 12 months based on the company's predictable operating model, continued margin expansion, and strong growth prospects.  Based on a price-to-earnings multiple of 15 (consistent with the company's historical average multiple range) and an FY98 EPS estimate of $1.15, we believe a reasonable 12-month target for CellStar shares would be $17.

In that same report, J.C. Bradford projected earnings of $0.31 per share for the third quarter of 1998 and $1.15 for fiscal year 1998.

36.  On or about July 14, 1998, the Company filed a report on Form 10-Q for the fiscal quarter ended May 31, 1998, which was signed by defendant Huggins, and which confirmed the previously announced financial results.  The Form 10-Q reported that as of May 31, 1998, the Company had $267,942,000 in accounts receivable which was net of $26,483,000 in allowances for

- 19 -

doubtful accounts.   The Form 10-Q also made the following statement:

> North American revenues increased $22.3 million, or 11.8%, from $189.1 million to $211.4 million.  The increase was largely due to growth in sales from the Company's Miami, Florida warehouse to customers exporting into South American countries.  In addition, the North American operations achieved growth in revenues from distribution and fulfillment contracts for the provision of products and value-added services.   [Emphasis added.]

The Form 10-Q also represented:

> Although the interim consolidated financial statements of CellStar Corporation (the "Company") are unaudited, it is the opinion of the Company's management that all adjustments (consisting of only normal recurring adjustments) necessary for a fair statement of the results have been reflected therein.

37.   On August 3, 1998, CellStar issued a press release disclosing that the SEC was investigating the Company's compliance with the federal securities laws.   The press release stated the Company's belief that the investigation was primarily related to CellStar's reporting of results in 1995 and 1996 not currently.

38.   The statements referenced above in ¶¶ 32, 34 and 36 were each materially false and misleading when issued for the reasons stated above in ¶ 31.   In addition, those statements were each materially false and misleading because:

(a)   it was not true that the Company had not seen any "significant deterioration", see ¶ 34 supra, in the ability of its customers to pay as Topp lacked any ability to pay for the

- 20 -

many millions of dollars of handsets it was purchasing from CellStar; and

(b)    given CellStar's experience with Topp, defendants lacked a reasonable basis for their statement that the pre-paid cellular business was "profitable" to the Company or Topp for that matter.

39.    Then, on September 21, 1998, CellStar issued a press release which shocked the investing public.  On that date, CellStar announced that the Company would not meet analysts' earnings expectations for the second half of 1998 because of "continued turmoil in the global markets" and, more importantly, because it was required to recognize 100% of Topp's losses as its own -- which amounted to $10-12 million per quarter.  Defendants revealed that CellStar had become the primary financier of Topp through its supply of handsets to Topp.  The press release stated in pertinent part as follows:

> Beginning in the third quarter, CellStar became the primary source of funding for Topp through the supply of phones.  Although the Topp investment was originally accounted for at cost, generally accepted accounting principles require that CellStar, as the principle source of Topp's capital, begin recognizing 100% of Topp's losses in the third quarter.  The impact of this charge on net income per share for the third quarter will be between $0.08 and $0.10 a share on a diluted basis.

In effect, CellStar's Topp-related receivables were converted to an investment in Topp.

- 21 -

40. Upon these revelations, CellStar's stock price declined substantially, dropping from $7.6875 per share to $5.00 per share, a more than 72% reduction from its Class Period high of $17.875.

41. On October 1, 1998, CellStar issued a press release with respect to its third quarter results, ending August 31, 1998. Net income was reported to be $2.4 million, well below income of $16.2 million in the comparable year earlier period. Revenues for the North American Region were reported to be $201.2 million in the third quarter, substantially lower than the $268.8 million for the comparable year earlier period.

42. On October 5, 1998, Institutional Investor reported that Moody's Investor Service, a major rating agency, changed the outlook on CellStar's $135 million credit facility to negative from positive. The rating change was reportedly prompted by concerns about the long-term effects of current volume and pricing issues being faced by the Company in high-growth emerging markets, such as Latin America.

43. On January 26, 1999, CellStar issued a press release announcing that through a "series of strategic initiatives" it was repositioning itself as a "more focused wireless carrier." The Company stated that it had reviewed all operations and that it would be:

- de-emphasizing or eliminating businesses, and writing off related assets, that do not support its growth strategy;

- targeting for sale its reseller operations, retail operations in the United

States and other operations that are non-essential to its core business;

• intensifying its focus on cost-control; and

• continuing to invest in operations that strengthen its direct relationships with wireless carriers and manufacturers.

44. That same day, CellStar issued a press release announcing its results for the fourth quarter of fiscal 1998, ending November 30, 1998. The Company announced that it had written-off CellStar's investment in Topp "due to Topp's continuing losses resulting from its rapid growth." This write-off was reported to be $20.1 million, or $0.23 per share. The magnitude of this write-off demonstrates that CellStar's sales to Topp was material and significant at all times during the Class Period.

45. During the Class Period, defendants materially misled the investing public, thereby inflating the price of CellStar common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, including, inter alia:

(a) that CellStar was booking a substantial and material amount of revenues in connection with alleged "sales" to Topp and that such sales were not bona fide sales as CellStar did

- 23 -

not expect that it would be paid by Topp and, in fact, was not seeking payment from Topp;

(b)   that CellStar had assumed Topp's obligation under the Uniden contract and, accordingly, had become the primary financier of Topp through its supply of handsets to Topp and steady accrual of receivables from Topp;

(c)   that CellStar's entry into the pre-paid cellular business via Topp was not succeeding as Topp was experiencing significant losses and was unable to pay CellStar for any of the handsets it had purchased from it;

(d)   that as a result of Topp's strained financial condition and its inability to pay CellStar for any of the handsets it had purchased from it, CellStar was searching for additional investors for Topp in an effort to recoup its investment in Topp and reverse Topp's financial decline;

(e)   based on (a)-(d), CellStar's previously announced investment in Topp was not "conservative", see ¶ 29 supra, and in fact was subject to with significant risk and uncertainty;

(f)   CellStar's reported financial results were artificially inflated and its financial statements were not prepared in accordance with GAAP as set forth in detail in ¶¶ 49-59 below;

(g)   that it was not true that CellStar's interim financial statements contained "all necessary adjustments for a

- 24 -

fair presentation" of CellStar's financial results as set forth in detail in ¶¶ 49-59 below;

(h)  based on the foregoing, defendants' beliefs, opinions, estimates as to CellStar, its business and operations were lacking in reasonable basis at all relevant times;

(i)  it was not true that the Company had not seen any "significant deterioration", see ¶ 34 supra, in the ability of its customers to pay as Topp lacked any ability to pay for the many millions of dollars of phones it was purchasing from CellStar; and

(j)  given CellStar's experience with Topp, defendants lacked a reasonable basis for their statement that the pre-paid cellular business was "profitable" to the Company or Topp for that matter.

46.  At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about CellStar's business, business practices and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of CellStar and its business, finances and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times.

- 25 -

Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's common stock at an artificially inflated price, thus causing the damages complained of herein.

47.   As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.   As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding CellStar, their control over, and/or receipt and/or modification of CellStar's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning CellStar, participated in the fraudulent scheme alleged herein.

### No Safe Harbor

48.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. The specific statements pleaded herein were not identified as "forward-looking statements" when made.   Nor was it stated with respect to any of the statements forming the basis of this

complaint that actual results "could differ materially from those projected."  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking was made the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of CellStar who knew that those statements were false when made.

### The Company's Financial Statements
### And Related Representations
### Were Materially False And Misleading

49.  As set forth above, CellStar represented that its financial statements for the second and third fiscal quarters ended February 28, 1998, and May 31, 1998, respectively, were prepared in accordance with GAAP and the rules and regulations of the SEC.  These representations were materially false and misleading when made because CellStar employed improper accounting practices which resulted in its reported financial statements not to be in conformity with GAAP and artificially inflated the Company's reported operating results.

50.  The Company's financial statements were materially false and misleading because CellStar's reported operating

- 27 -

results in each of those quarters were artificially inflated and because they failed to disclose material contingencies required by GAAP.  As explained more fully below, (i) defendants recognized profits from "sales" of handsets to Topp when they were not permitted under GAAP to do so, as collection of the sales price of the phones sold to Topps was not reasonably assured, and therefore materially overstated CellStar's operating results; and (ii) defendants, in violation of GAAP, failed to disclose the reasonable possibility that the Company may experience a loss as a result of its sales of handsets to Topp and therefore, materially overstated CellStar's operating results.

51.  Each of these accounting improprieties, standing alone, evidence defendants' misleading attempt to maintain the appearance that CellStar was experiencing strong growth and artificially inflated the value of the Company's common stock to the detriment of unsuspecting investors.  In these ways, defendants knew or recklessly disregarded that CellStar issued financial statements which violated GAAP and the rules and regulations of the SEC.

52.  GAAP is a term used to encompass the principles recognized by the SEC and the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  Financial statements filed with the SEC which do not conform to the requirements of

GAAP are presumptively misleading and inaccurate pursuant to Regulation S-X, 17 CFR 210.4-01(a)(1).

53.   GAAP provides that profit is deemed to be realized when a sale in the ordinary course of business is effected, unless the circumstances are such that the collection of the sale price is not reasonably assured.   Under such circumstances either the installment or cost recovery method of accounting would be used, which, in effect, postpones profit and revenue recognition until cash is collected.   (Accounting Principles Board ("APB") Opinion No. 10, ¶ 12).   In addition, GAAP provides that in recognizing revenue and gains, if collectibility of assets received for products is doubtful, revenues and gains may be recognized on the basis of cash received.   (Financial Accounting Standards Board ("FASB") Statement of Financial Accounting Concepts ("Concepts of Statements") No. 5. ¶ 84).

54.   As detailed above, CellStar shipped and recorded revenue on material amounts of sales to Topp.   These sales should not have been recorded as revenues because:

- Topp did not have the financial ability to pay for the phones it had purchased from CellStar and defendants knew or recklessly disregarded this fact; and

- Given Topp's financial condition, CellStar did not demand payment for the phones and did not expect to be paid for the phones.

Further, these conditions created at least a reasonable possibility that CellStar, in addition to not being able to collect the receivable due from Topps, would also be unable to

- 29 -

recover the phones sold to Topps.  This would give rise to a loss to Topps, equivalent to the cost of the phones sold. Accordingly, in addition to not recognizing revenues or profits on the sales to Topps, CellStar, as a miniumum, should have disclosed the contingency related to its exposure to such loss.

55.  GAAP requires that financial statements account for and disclose existing loss contingencies.  Such loss contingencies should be recognized and reported as a charge to income when: (a) information existing at the date of the financial statements indicates that it is probable (e.g., a likely chance) that an asset had been impaired or a liability had been incurred; and (b) the amount of such loss can be reasonably estimated.  FASB's Statement of Financial Accounting Standards ("SFAS"), No. 5, ¶ 8.

56.  When both of the above conditions are not met or if an exposure to loss exists in excess of the amount accrued, the financial statements should disclose such contingency when it is at least reasonably possible (e.g. a greater than slight chance but less than likely) that a loss or an additional loss may have been incurred.  SFAS No. 5, ¶ 10.  The disclosure should indicate the nature of the contingency and give an estimate of the possible loss or range of loss or state that such an estimate cannot be made.  Id.

57.  Indeed, the SEC's consideration of the importance of the above disclosure to an informed investment decision is illustrated in Regulation S-X [17 C.F.R. § 210.10-01], which

provides that disclosures in interim period financial statements may be abbreviated, except that, "where material contingencies exist, disclosure of such matters shall be provided even though a significant change since year end may not have occurred."

58. For the aforementioned reasons, CellStar's financial statements during the Class Period failed to comport with GAAP and SEC regulations and were inherently false and misleading. In addition to the accounting violations noted above, CellStar presented its financial statements in a manner which also violated at least the following provisions of GAAP:

(a) The principle that financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (Concepts Statement No. 1, ¶ 42);

(b) The principle that financial reporting should be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting (Concepts Statement No. 2, ¶¶ 58-59);

(c) The principle of completeness, which means that nothing is left out of the information that may be necessary

to ensure that it validly represents underlying events and conditions (Concepts Statement No. 2, ¶ 79);

(d)   The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered.   The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (Concepts Statement No. 2, ¶¶ 95, 97).

59.   In addition, the defendants knew or recklessly ignored that CellStar falsely failed to disclose the existence of known trends, events or uncertainties that they reasonably expected would have a material unfavorable impact on net revenues or income or that were reasonably likely to result in the Company's liquidity decreasing in a material way, in violation of Item 303 of Regulation S-K under the federal securities laws (17 C.F.R. 229.303).   Such failure rendered the Company's Class Period financial statements materially false and misleading.

## Applicability Of Presumption Of Reliance: Fraud-On-The-Market Doctrine

60.   At all relevant times, the market for CellStar common stock was an efficient market for the following reasons, among others:

(a)   CellStar common stock met the requirements for listing, and was listed and actively traded, on the NASDAQ National Market System, a highly efficient market;

(b)   As a regulated issuer, CellStar filed periodic public reports with the SEC and the NASD;

(c)   CellStar stock was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

(d)   CellStar regularly issued press releases which were carried by national newswires.  Each of these releases was publicly available and entered the public marketplace.

61.   As a result, the market for CellStar securities promptly digested current information with respect to CellStar from all publicly-available sources and reflected such information in CellStar stock price.  Under these circumstances, all purchasers of CellStar common stock during the Class Period suffered similar injury through their purchase of stock at artificially inflated prices and a presumption of reliance applies.

## FIRST CLAIM

### (Violations Of Section 10(b) Of The Exchange Act And Rule 10b-5 Promulgated Thereunder Against All Defendants)

62.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

63.   During the Class Period, Cellstar  and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiff and other Class members, as alleged

- 33 -

herein; (ii) artificially inflate and maintain the market price of Cellstar's common stock; and (iii) cause plaintiff and other members of the Class to purchase Cellstar's common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

64. Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Cellstar's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

65. In addition to the duties of full disclosure imposed on defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. Sections 210.01 et seq.) and Regulation S-K (17 C.F.R. Sections 229.10 et seq.) and other SEC

regulations, including accurate and truthful information with respect to the Company's operations, financial condition and earnings so that the market price of the Company's securities would be based on truthful, complete and accurate information.

66. Cellstar and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Cellstar as specified herein.

67. These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Cellstar's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Cellstar and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Cellstar's common stock during the Class Period.

68. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the

following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his or her responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

69.   The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or reck-lessly and for the purpose and effect of concealing Cellstar's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by defendants' overstatements

and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

70.   As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Cellstar's common stock was artificially inflated during the Class Period.   In ignorance of the fact that market prices of Cellstar's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired Cellstar's common stock during the Class Period at artificially high prices and were damaged thereby.

71.   At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.   Had plaintiff and the other members of the Class and the marketplace known of the true financial condition and business prospects of Cellstar, which were not disclosed by defendants, plaintiff and other

members of the Class would not have purchased or otherwise acquired their Cellstar common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

72.   By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

73.   As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

## SECOND CLAIM

### (Violation Of Section 20(a) Of The Exchange Act Against Individuals Defendants)

74.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

75.   The Individual Defendants acted as controlling persons of Cellstar within the meaning of Section 20(a) of the Exchange Act as alleged herein.   By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's acquisition integration problems, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.   The Individual

- 38 -

Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

76.   In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

77.   As set forth above, Cellstar and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**WHEREFORE**, plaintiff prays for relief and judgment, as follows:

(a)   Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying

plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and their counsel as Lead Counsel;

(b) Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

<b><u>JURY TRIAL DEMANDED</u></b>

Plaintiff hereby demands a trial by jury.

DATED:  June 14, 1999

Respectfully submitted,

**MILBERG WEISS BERSHAD HYNES & LERACH LLP**

By: _Maya Saxena_

Julian H. Kreeger
(Fla. Bar No. 098595)
Kenneth J. Vianale
(Member of Fla. Bar;
Fla. Bar No. Pending)
Maya Saxena
(Fla. Bar No. 095494)

5355 Town Center Road, Suite 900
Boca Raton, FL  33486
Tel:  (561) 361-5000
Fax:  (561) 367-8400

- and -

- 40 -

- and -

Steven G. Schulman
Samuel H. Rudman
One Pennsylvania Plaza
49th Floor
New York, NY  10119
(212) 594-5300

**STULL, STULL & BRODY**
Jules Brody
Aaron Brody
6 East 45th Street, Suite 500
New York, NY  10017
(212) 687-7230

**WEISS & YOURMAN**
Joseph H. Weiss
551 Fifth Avenue, Suite 1400
New York, NY  1016
(212) 682-3025

**Attorneys for Plaintiff**

- 41 -

## PLAINTIFF CERTIFICATION

MARK A. KRUG  ("Plaintiff") hereby states that:

1.    Plaintiff has reviewed the complaint and has authorized the filing of the complaint on his/her behalf.

2.    Plaintiff did not purchase any common stock/securities of CellStar Corporation at the direction of his/her counsel or in order to participate in this private action.

3.    Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.    The following includes all of Plaintiff's transactions in CellStar Corporation common stock/securities during the class period specified in the complaint:

| SECURITY (Common Stock, Call, Put, Bonds) | TRANSACTION (Purchase, Sale) | TRADE DATE | PRICE PER SECURITIES/SHARE | QUANTITY |
|---|---|---|---|---|
| Common Stock | Purchase | 6/22/98 | $25.50 | 200 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| | | | | |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

5.    Plaintiff has not served or sought to serve as a representative party on behalf of a class under the federal securities laws during the last three years, unless otherwise stated in the space below:

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of a class except to receive his pro rata share of any recovery, or as ordered or approved by the court including the award to a representative party of reasonable costs and expenses including lost wages relating to the representation of the class.

Plaintiff declares under penalty of perjury that the foregoing is true and correct.

Executed this __11__ day of __June__, 1999 in __St. Louis__, __Missouri__.
                                             (City)        (State)

JS 44
(Rev.

**CIVIL COVER SHEET**

ORIGINAL
99 1639

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**

MARK KRUG, on behalf of himself and all others similarly situated,

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF        St. Louis Cty.
(EXCEPT IN U.S. PLAINTIFF CASES)

**DEFENDANTS**

CELLSTAR CORPORATION, ALAN H. GOLDFIELD, RICHARD M. GOZIA and MARK Q. HUGGINS,

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT        Dallas
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

CIV-HOEVELER

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
MILBERG WEISS BERSHAD HYNES & LERACH LLP
5355 Town Center Road, Suite 900
Boca Raton, FL 33486   (561) 361-5000

ATTORNEYS (IF KNOWN)

MAGISTRATE JUDGE
DUBÉ

**(d)** CIRCLE COUNTY WHERE ACTION AROSE: DADE, MONROE, BROWARD, PALM BEACH, MARTIN, ST. LUCIE, INDIAN RIVER, OKEECHOBEE HIGHLANDS

**II. BASIS OF JURISDICTION**   (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☐ 3 Federal Question   XXX (U.S. Government Not a Party)
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN "X" IN ONE BOX FOR PLAINTIFF
(For Diversity Cases Only)   AND ONE BOX FOR DEFENDANT)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN**   (PLACE AN "X" IN ONE BOX ONLY)

XX Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

**V. NATURE OF SUIT**   (PLACE AN "X" IN ONE BOX ONLY)

| A CONTRACT | A TORTS | | FORFEITURE/PENALTY | A BANKRUPTCY | A OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | B☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury – Med Malpractice | B☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury – Product Liability | B☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | B☐ 630 Liquor Laws | **A PROPERTY RIGHTS** | B☐ 450 Commerce/ICC Rates/etc |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers Liability | | B☐ 640 R R & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | B☐ 650 Airline Regs | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| B☐ 152 Recovery of Defaulted Student Loans (Excl Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | B☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | B☐ 690 Other | | XXX 850 Securities Commodities/ Exchange |
| B☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **A LABOR** | **B SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 160 Stockholders Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | | | | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor Mgmt Relations | ☐ 863 DIWC DIWW (405(g)) | ☐ 893 Environmental Matters |
| **A REAL PROPERTY** | **A CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| | | | ☐ 730 Labor Mgmt Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | B☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| B☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** | | **FEDERAL TAX SUITS** | |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | B☐ 530 General | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U S Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 444 Welfare | A☐ 535 Death Penalty | | | ☐ 890 Other Statutory Actions |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | B☐ 540 Mandamus & Other | A☐ 791 Empl Ret Inc Security Act | A☐ 871 IRS – Third Party 26 USC 7609 | A OR B |
| ☐ 290 All Other Real Property | | B☐ 550 Civil Rights | | | |
| | | B☐ 555 Prison Condition | | | |

**VI. CAUSE OF ACTION**   (CITE THE U S CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5

LENGTH OF TRIAL
via____days estimated (for both sides to try entire case)

**VII. REQUESTED IN COMPLAINT:**   XXX CHECK IF THIS IS A **CLASS ACTION** ☐ UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   X YES   ☐ NO

**VIII. RELATED CASE(S) IF ANY**   (See instructions):   JUDGE   Graham   DOCKET NUMBER   99-1502

DATE   6/14/99
SIGNATURE OF ATTORNEY OF RECORD   Maya Saxena

FOR OFFICE USE ONLY

RECEIPT # 710571   AMOUNT $150-00   APPLYING IFP_____   JUDGE Hoeveler   MAG JUDGE Dubé